IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 13-cv-00570-RBJ

MARGO L. BECERRA,

    Plaintiff,

v.

CAROLYN W. COLVIN[1], Acting Commissioner of the Social Security Administration,

    Defendant.

## ORDER

This matter is before the Court on review of the Commissioner's decision denying plaintiff Margo Becerra's application for disability insurance benefits pursuant to Title II of the Social Security Act. Jurisdiction is proper under 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

This appeal is based upon the administrative record and briefs submitted by the parties. In reviewing a final decision by the Commissioner, the role of the district court is to examine the record and determine whether it "contains substantial evidence to support the [Commissioner's] decision and whether the [Commissioner] applied the correct legal standards." *Rickets v. Apfel*, 16 F.Supp.2d 1280, 1287 (D. Colo. 1998). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wilson v. Astrue*, 602 F.3d

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, and thus her name is substituted for that of Michael J. Astrue as the defendant in this suit. Fed. R. Civ. P. 25(d)(1). By virtue of the last sentence of 42 U.S.C. § 405(g), no further action needs to be taken to continue this lawsuit.

1136, 1140 (10th Cir. 2010) (citations omitted). Evidence is not substantial if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

The Court "may neither reweigh the evidence nor substitute [its] judgment for that of the agency." *Harper v. Colvin*, 528 F. App'x 887, 890 (10th Cir. 2013) (citations omitted). Thus, although some evidence could support contrary findings, the Court "may not displace the agency's choice between two fairly conflicting views," even if the Court might "have made a different choice had the matter been before it de novo." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). However, the Court must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007) (citations omitted).

Upon review, the district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 45 U.S.C. § 405(g).

## PROCEDURAL HISTORY

Ms. Becerra first applied for disability insurance benefits on February 5, 2011. She claimed inability to take part in substantially gainful activity since her alleged onset date of July 9, 2003 due to a number of conditions: closed head injury leading to headaches, migraines, memory loss, and other cognitive problems; back injury; neck injury; depression; and arm pain. Ms. Becerra's date last insured is September 30, 2014. The Commissioner denied Ms. Becerra's application on August 1, 2011. Ms. Becerra then requested a hearing before an administrative law judge (ALJ), and the ALJ conducted a hearing on June 6, 2012. During the hearing, Ms.

Becerra, through her counsel, amended the alleged onset date to June 12, 2009. On June 23, 2012, ALJ Kathryn D. Burgchardt issued an opinion denying benefits. The Appeals Council denied Ms. Becerra's request for review on February 1, 2013. Thereafter, Ms. Becerra filed a timely appeal with this Court.

## BACKGROUND

Ms. Becerra was involved in a motor vehicle crash in 2003 in which she sustained a closed head injury and a lower back injury. Though she recovered enough to continue working through October 2009, Ms. Becerra currently suffers from chronic headaches and migraines, lumbar spine degenerative disc disease causing chronic lower back pain, chronic neck pain, and symptoms of numbness and tingling in her upper extremities. Ms. Becerra has also been diagnosed with cognitive disorder not otherwise specified (likely stemming from the closed head injury), major depressive disorder in partial remission, and posttraumatic stress disorder in partial remission. R. 1205–06. Ms. Becerra has been prescribed medications for her physical pain and for her depression.

### Medical Evidence

On June 10, 2009, Ms. Becerra went to an army hospital with complaints of lower back pain. R. 491. She reported that she had sustained a lower back injury and a closed head injury with post-concussive syndrome six years earlier in a motor vehicle accident. R. 493. She had been seeing a chiropractor for the previous six years, and the chiropractor had asked her to have an MRI done of her lumbar spine without contrast. *Id.* Further, he asked that she be referred for physical therapy for neck and back stabilization. *Id.* The examination results were normal with her lumbar spine showing good strength and a good range of motion, and negative straight leg raising tests. *Id.* Ms. Becerra reported that she was not having any radicular symptoms at the

time, but that she occasionally had them down her right leg. *Id.* The doctor released Ms. Becerra without limitations. *Id.*

The MRI revealed a mild progression of degenerative disk disease in the lower lumbar spine with mild disk height loss at L3-4 and L4-5 since Ms. Becerra's previous examination and stable, mild disk narrowing at L5-S1. R. 488. The MRI also showed mild broad-based posterior disk bulge at L3-4 through L5-S1 with no significant narrowing of the central canal, lateral recesses, or neural foramina and no evidence of nerve root impingement. *Id.* Finally, it showed mild facet disease at the L4-5 level and mild endplate changes at L5-S1. *Id.* Otherwise, it was an "unremarkable MRI of the lumbar spine." *Id.*

On August 18, 2009, Ms. Becerra reported to her physical therapist that her current pain was 0/10, with her pain at no more than 4/10 that past week. R. 657. She said that she had just returned from vacation in Hawaii, and that she had been able to participate in activities without limitation. *Id.*

On February 3, 2010, Ms. Becerra went to a clinic complaining of lower back pain. R. 768. She told the doctor that she had been skiing that past weekend and admitted to "overdoing it" and straining her lumbar spine. *Id.* The doctor found that there was palpable tenderness in the lumbar area, slight bilateral spasms, and that Ms. Becerra's gait and posture were moderately antalgic. R. 769. Ms. Becerra was instructed to take prescribed medication, and a referral was made to a physical therapy group for evaluation and treatment. *Id.* On February 10, 2010, Ms. Becerra went to physical therapy and reported that she had been suffering from lower back pain radiating into the buttocks since she went skiing two weeks earlier. R. 579.

On October 19, 2010, Ms. Becerra reported to her physical therapist that she had a severe limitation in lifting, bending, and performing household chores. R. 573. She also reported that

she could sit for less than one hour at a time. *Id.* Her physical therapist found that Ms. Becerra had the following ranges of motion: Flexion: 75% hands down; Extension: 25% with pain; Sidebending Right: 100% with pain; Sidebending Left: 100% with pain; Rotation Right: 100% with pain; Rotation Left: 100% with pain. R. 573–74. Ms. Becerra had positive results in both her legs for her straight leg test, slump test (lumbar), and piriformis. R. 574. She had negative results in both legs for her 90-90 hamstring tests. *Id.* The physical therapist found that Ms. Becerra suffered from a decrease in functional status but that her subjective and objective deficits could be addressed by physical therapy. R. 574.

On March 31, 2011, Ms. Becerra rolled her left ankle. *See* R. 1407. The next day she went to see a doctor, who found that Ms. Becerra had suffered a sprain; there was no fracture of dislocation. R. 1406. During a May 25 follow up appointment, the doctor found that the ankle showed no abnormalities, and that the joint was stable, but that Ms. Becerra reported tenderness to palpation in the area of the anterior talo-tibial joint. R. 1400. The doctor added that the ankle joint pain was "[w]ithout evident pathology and atypical in nature" and prescribed anti-inflammatory medication. R. 1401. In June, an MRI was ordered after Ms. Becerra reported persisting pain, in particular shooting/throbbing sensations through the lateral and medial aspects of the ankle. R. 1394, 1396.

On October 24, 2011, Ms. Becerra met with Kevin S. Borchard, M.D. for an evaluation of her ankle, which was still causing her pain. R. 1358. She reported "little improvement" with physical therapy. *Id.* During his examination, Dr. Borchard found that there was no significant soft tissue edema or ecchymosis. R. 1359. He observed that the range of motion at the ankle was 5 degrees of dorsiflexion and 30 degrees of plantar flexion. *Id.* Ms. Becerra reported mild tenderness along the posterior tibialis tendon distal to the medial malleolus, and tenderness over

5

the arch which courses along the peroneus longus tendon. *Id.* Dr. Borchard concluded that the left foot and ankle suffered from posterior tibialis tendinitis and peroneal tendinitis, and discussed treatment options, including the use of a Cam Walker. R. 1359–60. On December 1, 2011, Ms. Becerra reported continued pain and no relief from the use of the Cam Walker. R. 1349–50.

On December 21, 2011, Ms. Becerra saw another doctor, Alan Paul Garcia, M.D., about her ankle. R. 1343–46. Dr. Garcia observed that Ms. Becerra had an antalgic gait, a limited active range of motion, and an inability to perform provocative test due to stiffness. R. 1345–46. He reviewed the MRI of her ankle and noted that it demonstrated calcaneonavicular coalition with arthritic changes to the ankle. R. 1346. He recommended that Ms. Becerra be seen by an orthopedic foot and ankle specialist.

On January 25, 2012, Ms. Becerra met with John R. Shank, M.D., an orthopedic foot and ankle specialist. He found that a three view radiograph of the ankle demonstrated mild closing down of the ankle anteriorly on the lateral radiograph with a calcaneal navicular tarsal coalition, which was also confirmed by an MRI. R. 1418. Ms. Becerra had a slight thickening of the peroneal tendons with evidence of a prior ATFL tear. *Id.* There was no evidence of a fracture or chondral defect. Dr. Shank injected her ankle with medication, with directions to follow up over the next several weeks to determine a treatment plan based on her response to the injection. R. 1419. By April 27, 2012, Ms. Becerra was reporting "significant improvement." R. 1413.

On June 30, 2011, Ms. Becerra underwent a consultative examination with Ryan Otten, M.D. Ms. Becerra complained of cognitive issues, migraines, and chronic neck and lower back pain. R. 1195. She reported that she had been suffering from short-term memory limitations and a decreased ability to multitask ever since her closed-head injury. *Id.* She said that she

experiences migraines about once a week, and that they tend to occur when she is under a lot of stress or in a stressful environment. *Id.* In regards to her chronic lower back pain, she reported that she needs to change position constantly in order to stay comfortable. *Id.* She also said she suffers from constant pain in her neck and pain and tingling in both arms. *Id.* Finally, she told Dr. Otten about her sprained ankle. *Id.* In regards to her daily living activities, Ms. Becerra reported that she is able to get in and out of bed, dress herself, bathe herself, drive, cook, and clean. R. 1196. She told Dr. Otten that she enjoys a number of hobbies, including sewing, golf, skiing, bowling, reading, and baking. R. 1197. She also said that she would normally enjoy walking but that she had been refraining from it since her ankle sprain. *Id.*

Dr. Otten observed that Ms. Becerra did not appear to have ataxic or antalgic ambulation, though her Romberg was positive. R. 1198. He recorded Ms. Becerra's ranges of motion, noting that there was "moderate discernible discomfort with [her] ranges of motion in the neck," and that there was "mild discernible discomfort with [her] ranges of motion in the back." R. 1199. He wrote that Ms. Becerra "seemed moderately uncomfortable while supine on the examination table and this did seem to progress during the exam." *Id.* In regards to her spine, Dr. Otten found that there was "mild tenderness of the spinous processes of the cervical spine and moderate tenderness of the spinous processes of the lumbar spine." *Id.* Overall, Ms. Becerra "appeared to sit comfortably during the exam and without pain-mitigating movements. She did not appear uncomfortable getting on and off the examination table, removing shoes, and arose spontaneously and unaided from a seated position without discernable discomfort." R. 1197.

Dr. Otten diagnosed Ms. Becerra with mild cognitive defects and memory problems, disequilibrium, chronic headaches and migraines, lumbar spine degenerative disc disease, and cervical spine degenerative disc disease. R. 1200. He found that there "were no obvious

7

discrepancies between the claimant's complaints and the physical exam findings. Based on the objective findings, there are no recommended limitations on the number of hours the claimant should be able to stand or sit during a normal 8-hour workday." *Id.* He did recommend a walking limitation of 3–4 hours per 8-hour day, but only due to her acute ankle sprain, adding that "[i]t is likely that there will no longer be a walking limitation needed once the ankle has healed." *Id.* He found that Ms. Becerra could bend, squat, crouch, stoop, push, and pull occasionally (less than four hours during an 8-hour workday), secondary to cervical and lumbar spine degenerative disc disease. *Id.* He found that Ms. Becerra should be able to lift or carry frequently less than 20 pounds or occasionally less than 40 pounds. *Id.* He added that Ms. Becerra should have only occasional exposure to stairs and ladders. *Id.* He did not recommend any assistive devices at that time. *Id.* Finally, he found that Ms. Becerra would likely have difficulty with highly complex or stressful environments. *Id.*

On July 11, 2011, Ms. Becerra underwent a psychological consultative evaluation with Louis Hoffman, Ph.D. R. 1201. Dr. Hoffman performed a mental status examination, which resulted in a number of findings. First, he found that Ms. Becerra had an overall IQ score of 89, in the low average range. R. 1205. She also fell in the low average range for verbal comprehension and processing speed, though her perceptual reasoning was in the high average range. *Id.* Her working memory score was in the borderline range—her most significant impairment—such that it was possible Ms. Becerra "would have some impairment in her Working Memory that would impact her in a work setting." *Id.* Outside of her working memory, Dr. Hoffman found that "there was not significant evidence that her cognitive functioning impairment would be beyond what is mild." *Id.* He qualified this conclusion, noting that it was possible the evaluation was not fully representative of Ms. Becerra's functioning in a

work setting when having to deal with fatigue and additional pain symptoms, *id.*, but he said that it did "not appear likely that [Ms. Becerra] would have difficulty learning and carrying out simple work-related tasks beyond a mild and maybe moderate level when her pain and fatigue is increased," R. 1206.

Dr. Hoffman diagnosed Ms. Becerra with cognitive disorder not otherwise specified, posttraumatic stress disorder in partial remission, and major depressive disorder in partial remission. R. 1205–06. He gave Ms. Becerra a Global Assessment of Functioning ("GAF") score of 63. R. 1206. This score indicates that she was experiencing "only mild psychologically based symptoms or resulting functional impairment." R. 19 (citing Diagnostic and Statistical Manual of Mental Disorders, 4th ed., American Psychiatric Assoc., Text Revision, 2000).

Dr. Hoffman concluded that Ms. Becerra's cognitive disorder appeared "fairly mild" at that time, though he strongly recommended that a more thorough evaluation of her memory functioning be conducted. R. 1206. He added that it did not appear "very likely that Ms. Becerra will show significant improvement in her functioning, particularly given that what she has been experiencing thus far is deterioration. Her functioning may stabilize some if she is not regularly fatigued and in as much pain." R. 1207.

### Reported Limitations

After applying for disability benefits, Ms. Becerra filled out a Function Report, R. 190–200, and testified about her functional limitations in an administrative hearing, R. 29–53. In the report, Ms. Becerra wrote that she had "poor memory, focus, concentration and recall problems that limit [her ability] to keep a job and function." R. 190. She reported a limitation in her capacity to follow written and spoken instructions because of an inability to process information quickly. *Id.* She said that she is forced to make notes reminding her to do certain tasks,

including take her medications. R. 191. Though Ms. Becerra cooks, she has burned dishes because she gets distracted. R. 192. When she bakes, she has to measure everything out ahead of time because she cannot remember whether she already added an ingredient. R. 47, 194.

Ms. Becerra reported that she cannot walk for long periods of time and that standing too long will cause her pain, along with other postural positions such as squatting, bending, reaching, and kneeling. R. 195. In particular, Ms. Becerra testified that she can walk about two miles at a time, sit for about an hour or two before needing to get up, and stand for about an hour before needing to sit down. R. 36–37. She uses heat, topical patches and creams, medications, physical therapy, tens unit, and a hot tub to relieve her pain. *Id.*

Though Ms. Becerra can drive, she has to limit her driving time because she cannot stay in one position for long periods of time. R. 193. She also loses focus and gets lost, needing to stop to get herself oriented again. R. 48, 193. Though she can do light cleaning and laundry, her husband needs to carry the laundry downstairs and has to help her clean heavy things. R. 192. That said, Ms. Becerra testified that she could lift about 25–30 pounds, though not repetitively. R. 37, 50.

Finally, Ms. Becerra reported that she enjoys watching TV, reading, sewing, skiing, bowling, baking, and golfing, but added that she can no longer ski, bowl, or golf and has limitations with her other hobbies. R. 194; *see also* R. 39–41. She also has "a lot of pain in [her] wrist[,] arm[,] and fingers[.] [W]orking with them too much causes a lot of pain." R. 197. Overall, Ms. Becerra reported feeling constant pain ranging from moderate to severe on a daily basis. R. 198. She said that it has made her miss work and that she can rarely participate in social activities with her family. *Id.*

**Denial of the Claim**

10

The Social Security Administration uses a five part process to determine whether a claimant qualifies for disability insurance benefits. 20 CFR § 404.1520. At **step one**, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 CFR § 404.1520(a)(4)(i). The ALJ found that Ms. Becerra had not engaged in substantial gainful activity since her amended alleged onset date of June 12, 2009.[2][3] R. 14.

At **step two**, the ALJ must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that are "severe." 20 CFR § 404.1520(a)(4)(ii). The ALJ found that Ms. Becerra suffered from the following severe impairments: cervicalgia, degenerative disc disease of the lumbar spine, cognitive disorder, osteoarthritis of the left ankle, closed head injury, and depression. R. 14.

At **step three**, the ALJ must determine whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (the "Listings"). 20 CFR § 404.1520(a)(4)(iii). The ALJ determined that none of Ms. Becerra's impairments—alone or in combination—met or medically equaled one of the listed impairments in the Listings. R. 15.

Before reaching step four, the ALJ is required to determine the claimant's residual functional capacity ("RFC"). *See* R. 17; 20 CFR § 404.1520(a)(4)(iv). An RFC represents "the most [a claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). The RFC is "the claimant's maximum sustained work capability." *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988). The ALJ found that Ms. Becerra has an RFC to perform "light work" as defined in 20 CFR § 404.1567(b), with a number of limitations: only occasionally pushing and

---

[2] While Ms. Becerra worked through October 2009, the earnings from her part-time employment were minimal such that her work did not constitute substantial gainful activity. *See* R. 30.

[3] Based on the amended alleged date of onset, Ms. Becerra is categorized as an individual "closely approaching advanced age." 20 C.F.R. § 404.1563.

pulling with the left lower extremities within certain weight restrictions; only occasionally climbing ramps, stairs, ladders, or scaffolds; no more than frequently reaching overhead with her bilateral upper extremities; no more than frequently balancing, stooping, crouching, kneeling, or crawling; and only occasional contact with the general public. R. 16. The ALJ reached this decision by taking into consideration Ms. Becerra's initial application, the testimony from the hearing, the objective medical evidence on file, and the record as a whole. R. 16–20.

At **step four**, the ALJ must determine whether the claimant has the residual functional capacity to perform the requirements of her past work. 20 CFR § 404.1520(a)(4)(iv). The ALJ found that Ms. Becerra could no longer perform past relevant work due to the excessive skill requirements of those jobs. R. 20.

At **step five** the ALJ must determine whether the claimant is able to do any other work that exists in significant numbers in the national economy considering the claimant's RFC, age, education, and work experience. 20 CFR § 404.1520(a)(4)(v). Taking into account the limitations noted above, the ALJ found that Ms. Becerra would be able to perform the requirements of representative unskilled, light exertional occupations such as router, marker, and inspector, all three of which exist in significant numbers in the national economy. R. 21.

## ANALYSIS

Ms. Becerra raises two issues on appeal. She argues that (1) the ALJ's credibility analysis was based on an incorrect legal standard and not supported by substantial evidence; and (2) the ALJ's RFC assessment was based on an incorrect legal standard and not supported by substantial evidence.

After reviewing the briefs submitted by the parties, the written decision of the ALJ, and the entire administrative record, the Court finds that the ALJ gave Ms. Becerra's case a thorough

review accompanied by a detailed explanation of her decision.  ALJ Burgchardt used the correct legal standard when undertaking the credibility analysis and the RFC assessment, and both results were supported by substantial evidence in the record.

### A. Credibility

Ms. Becerra argues that the ALJ erred as a matter of law when she found that "Ms. Becerra's asserted pain levels were not credible" based on Ms. Becerra's "ability to engage in a wide variety of . . . daily activities."  [ECF No. 14 at 15].  In particular, Ms. Becerra argues that the ALJ "did not consider all of the relevant evidence," and that Ms. Becerra's ability to perform a limited range of activities "should not be determinative of whether she has the residual functional capacity to perform light work over the course of a normal workweek."  *Id.* at 16.  Ms. Becerra mischaracterizes the ALJ's analysis and findings.

First, ALJ Burgchardt discussed a variety of factors that led to her credibility determination, including discrepancies among Ms. Becerra's statements, inconsistencies between statements of pain and reported activities, and an evaluation of the objective medical evidence on file.  *See* R. 16–20.  As to the medical evidence, the ALJ found that it "fails to provide support for a finding that the claimant has experienced a level of dysfunction matching her complaints of pain and other reported symptoms."  R. 17.  Second, ALJ Burgchardt took Ms. Becerra's statements regarding her range of daily activities to reflect only on her credibility, not on her ability to work.  R. 17 ("While these reported activities do not necessarily reflect on [Ms. Becerra's] ability to sustain work-related activities throughout a regular schedule, they are nevertheless inconsistent with her allegation of such extensive physical and mental limitations.").  Overall, the Court finds that the ALJ took into account a number of relevant factors when

13

assessing Ms. Becerra's credibility, and that there is substantial evidence in the record supporting her credibility determination.

**B. RFC Assessment**

Ms. Becerra's second argument is that the ALJ erred as a matter of law by failing to consider the limiting effects of all of the claimant's impairments, even those that are not severe. Ms. Becerra contends that the ALJ's RFC assessment erroneously discounted (1) Dr. Otten's finding that Ms. Becerra could walk no more than 3–4 hours in a day; and (2) Dr. Hoffman's qualifications regarding Ms. Becerra's cognitive functions. [ECF No. 14 at 17–18].

To begin, Dr. Otten examined Ms. Becerra on June 30, 2011, almost a year before the ALJ hearing and decision. At that time, Dr. Otten found that Ms. Becerra could only walk for 3–4 hours in an 8-hour day due to an acute ankle sprain that had occurred a few months earlier. R. 1200. He wrote, "It is likely that there will no longer be a walking limitation needed once the ankle has healed." *Id.* The ALJ took Dr. Otten's qualification into account in her RFC assessment by considering whether recent medical records indicated that Ms. Becerra's sprained ankle had improved, R. 19, which they had, R. 1413. In fact, the ALJ added that medical records from June 2011 through April 2012 showed that Ms. Becerra did not exhibit instability in her ankle, despite the sprain, and that she exhibited normal gait, balance, and stance. R. 19. The Court finds that the ALJ gave thorough and sufficient reasons supporting her determination that Dr. Otten's walking limitation was no longer applicable.

As to Ms. Becerra's cognitive limitations, the Court recognizes that Dr. Hoffman made two notable qualifications in his report. First, he "strongly recommended that a more thorough evaluation of [Ms. Becerra's] memory functioning be conducted," R. 1206, and none ever was. However, in another part of his evaluation, Dr. Hoffman wrote that the additional testing was needed to determine Ms. Becerra's "ability to learn and carry out more complex work-related

14

tasks," R. 1206, thereby suggesting that Ms. Becerra could perform simple tasks without further evaluation. Second, Dr. Hoffman noted that "[t]here also appears to be an interaction between [Ms. Becerra's] physical health problems, particularly pain issues, and fatigue with her psychological functioning. There may be times where her functioning is somewhat decreased compared to what was evidenced in this evaluation. This should be taken into consideration in the current appraisals of her functioning." R. 1207. Yet, Dr. Hoffman also wrote that "[i]t does not appear likely that [Ms. Becerra] would have difficulty learning and carrying out simple work-related tasks beyond a mild and maybe moderate level when her pain and fatigue is increased." R. 1206. Finally, Dr. Hoffman ascribed to Ms. Becerra a GAF score of 63, R. 1206, which indicates that she was experiencing "only mild psychologically based symptoms or resulting functional impairment," R. 19.

ALJ Burgchardt considered Dr. Hoffman's report along with medical evidence from treating sources. R. 19–20. She found that overall there was "little evidence of ongoing psychological distress," and that Ms. Becerra "would be able to complete a normal work day and work week if her job tasks were simple in nature, and did not involve significant interaction with others." R. 20. The Court finds that the ALJ took into account Dr. Hoffman's qualifications and properly incorporated Ms. Becerra's cognitive limitations into the RFC assessment.

## CONCLUSION

The Court finds that the credibility analysis and the RFC assessment were both supported by substantial evidence in the record, and that neither suffered from legal errors. The evidence in the record could be read as indicating that Ms. Becerra's condition is worsening. Whether a different onset date and new evidence might support a disability claim is beyond the scope of this

review. However, this decision does not foreclose Ms. Becerra's right to reapply for disability benefits in the future.

## ORDER

The decision of the Commissioner is AFFIRMED.

DATED this 24th day of April, 2014.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge